UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LJUBISA PERKOVIC,

    Plaintiff,

v.

MARINE CITY POLICE OFFICER
HEASLIP, ET AL.,

    Defendants.
                                  /

Case No. 04-74875

Honorable Nancy G. Edmunds

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [23]**

Plaintiff filed this lawsuit on behalf of his deceased brother, Tomo Perkovic, alleging both general tort liability and liability under the Fourth Amendment, Fourteenth Amendment, and 42 U.S.C. § 1983. Plaintiff's complaint names as Defendants Marine City Police Officer James Heaslip, Marine City Police Chief Ron Krueger, and the City of Marine City, Michigan. On February 11, 2005, this Court dismissed Plaintiff's state law tort claims. Defendants now move for summary judgment of Plaintiff's remaining claims under Section 1983.

Plaintiff does not oppose dismissal of Defendants Krueger or the City of Marine City, and abandons his arguments regarding Defendants' failure to provide adequate medical care. The Court therefore GRANTS Defendants' Motion for Summary Judgment as to Defendants Krueger and the City of Marine City.

A genuine issue of material fact exists, however, as to Plaintiff's Fourth Amendment unreasonable seizure claim brought against James Heaslip under Section 1983. For the following reasons, the Court DENIES Defendant Heaslip's Motion for Summary Judgment.

**I.    Facts**

At about 10:00 on the evening of January 25, 2004, Evelyn Milham was with her son and daughter at their rural Cottrellville Township, Michigan, home. Ms. Milham was watching television in her bed when she began to hear strange noises outside. She was then startled by a "blood curdling scream," followed by pounding at the front door:

> I started to get into bed and I heard like a bloodcurdling scream . . . . That sounded like it was from the backyard. Then I like just jumped up and ran to my son's room and I said somebody or something's out there, and I was kind of yelling at him to turn everything off. And then I went back into my room and I called 911, and I was coming back into the hallway, and that's when I heard somebody smash against the front door . . . . [I]t sounded like somebody was like throwing their body against the door . . . like somebody was going to break the door in.

(Milham Dep. at 7-8.) The pounding went on for about five minutes, while Ms. Milham and her son made frantic telephone calls to 911 and to an uncle who lived nearby. (*Id.* at 9-10.) When the noise stopped, Ms. Milham and her son looked outside but could not see anything. (*Id.* at 10.) Ms. Milham later discovered that the screen to her front door had been "torn up" and that a metal snow shovel had gone missing. (*Id.* at 13.)

At about 10:20 p.m., Marine City Police Officer James Heaslip received a radio dispatch to a possible breaking and entering in progress in nearby Cottrellville Township.[1] (Heaslip Dep. at 21-22.)

Around the same time, several motorists encountered an erratic man in the middle of Shea Road, a fifty-five mile per hour highway in Cottrellville Township.  Sandi Clemons, driving with her young child in the back seat and her boyfriend following in the automobile behind her, states that a man came at her car with a snow shovel "like he was out to kill." He swung the shovel at her car twice, but she swerved onto the shoulder of the road to get around him.  (Clemens Dep. at 12-15.)  Her boyfriend, Edward Gruszczynski, also states that the man swung the shovel at his car--"[l]ike a baseball bat"--but that he did not make contact.  (Gruszczynski Dep. at 5.)  Nicholas Braun's Chevrolet Monte Carlo SS was less lucky; Braun states that when he slowed down to avoid hitting a man in the middle of Shea Road, the man swung a shovel and "took a pretty nice chunk out of the hood . . . . It went into the metal."  (Braun Dep. at 7-8.)  And when Anthony Toton saw a man standing in the middle fo the road, he pulled over to help.  "[H]e just screamed, swung the shovel, hit the mirror of my car, which hit, broke all of the glass, hit the inside of my car.  I punched on the gas and he swat and hit the car again."  (Toton Dep. at 6.)

After Officer Heaslip found nothing suspicious at the Milham home, he came across a driver who reported a shovel attack in Shea Road.  Shortly afterward, two more drivers reported similar incidents.  Heaslip states, "Both drivers of the other two cars had told me that there was a guy further down on Shea Road . . . .  The guy was holding a shovel,

---

[1] A "Mutual Aid Agreement" between Marine City and Cottrellville Township authorized Heaslip to exercise police powers.

3

swinging it at their cars and acting like a lunatic . . . ." (Heaslip Dep. at 24.) Heaslip, who was the only law enforcement officer in the area,[2] went looking for the assailant.

Officer Heaslip encountered the man in the middle of Shea Road, "standing with his feet together, his arms are up in the air; I don't know what he was doing, if he was practicing some sort of a breathing exercise or--I don't know." (*Id.* at 30.) Heaslip very clearly states in his deposition that "he doesn't have a shovel in his hand; he has nothing in his hand." (*Id.* at 29.) He cannot now explain why, but when he stopped his vehicle, Heaslip stated over the radio, "I'm gonna be out with him almost to Palms in the middle of the road with a shovel. Give me a signal 10." (St. Clair County Rep. at 48.)[3]

Heaslip stepped out of his vehicle and stood about forty feet away from the man. The man turned around and looked at Heaslip. Heaslip states, "[H]e was clenching his teeth, he was flexing his neck muscles, and the first comments out of his mouth was he was going to kill me and kick my ass." (Heaslip Dep. at 31.) The man approached Heaslip in a threatening manner:

> I stood near my patrol car, the subject continued to walk towards me. I began giving him orders to get on the ground, get on his knees, to stop, and he refused all my commands. He began doing karate-type kicks and karate-

---

[2]Heaslip states that he had called for backup, and other officers were on their way. (Heaslip Dep. at 25.)

[3]A "signal 10" appears to be a means to clear up radio lines for a moment before a potential emergency. In case Officer Heaslip would need to call for help or make other radio communication, he wanted to be sure that others were not using the radio for less urgent business. (Heaslip Dep. at 28.) Heaslip estimates that only a few seconds passed between his transmitting a "signal 10" and his face-to-face contact with the man, and it appears that Heaslip *saw* the man when he made the transmission. (*Id.* at 34.) Heaslip was shown this transcript and asked, "Can you explain to me why you would have told dispatch he had a shovel if he didn't?" Heaslip responded, "I can't explain that to you; I don't know." (Heaslip Dep. at 30.)

>   type punches as he came towards me . . . .  He was kicking and punching and saying that he was going to kill me.

(*Id.* at 32.)

When the man got close, Heaslip began to back away.  Heaslip opened his metal expandable baton "and kept it in a ready position." (*Id.* at 33.)  The man delivered a "roundhouse kick," which Heaslip blocked.  Heaslip then struck the man on his left thigh with the baton, "[a]s hard as I could." (*Id.* at 39-40.)  The baton strike "did absolutely nothing" to fend off Heaslip's attacker.  At that point, Heaslip states, "[h]e's grunting, he's still telling me he's going to kill me and kick my ass." (*Id.* at 40.)  The man kicked again and just missed hitting Heaslip in the chest.  Heaslip landed another baton blow to the man's left thigh, "as hard as I could." (*Id.* at 41.)  The attacker then kicked Heaslip's baton out of his hand and continued approaching: "Once I lost my baton, it was now on the ground, he lunged at me, came at me still grunting, still with the teeth grinding; I drew my department-issued weapon and I fired one round." (*Id.* at 42.)  Heaslip hit his attacker in the chest and the man died shortly later.  Officer Heaslip is the only living witnesses to this encounter.

The deceased was later determined to be Tomo Perkovic, an immigrant from Montenegro who had lived in the United States for about ten years.  Perkovic's disabled vehicle was found about three-quarters of a mile from the Milham home and an additional mile from the scene of the shooting.

5

It is unclear what caused Perkovic to act the way that he did.[4] His autopsy revealed the presence of no illicit drugs (Pl. Ex. H), and his brother Ljubisa[5] states that Perkovic was not a drug user and never drank. He also states that to his knowledge, Perkovic had no psychiatric problems. Ljubisa states that he lived together with Perkovic in Shelby Township, Michigan. (Ljubisa Dep. at 12.) He later states, however, that he had not seen his brother in the three or four months preceding his death. (*Id.* at 26.)

The investigation following this incident revealed a number of important facts about two potentially relevant issues: Heaslip's alleged baton use and Perkovic's physical ability to act in the manner Heaslip alleges.

Heaslip's baton was not found lying on the ground at the scene of the shooting, where a police officer would be trained to leave it. Rather, the baton was in Heaslip's equipment belt. Heaslip explains that he picked up his baton because he was unsure whether his shot hit his attacker, and he did not want to risk the man getting up and grabbing the baton. (Heaslip Dep. at 51.)

In addition, the forensic pathologist, Kanu Virani, found no bruises on Perkovic's thighs during his autopsy. He states that he would "expect some bruising" to result from the type of blows described in Heaslip's deposition, given that Heaslip is 6'4" and 275

---

[4]Plaintiff's theory is that when Tomo arrived at the Milham home, "it appears he attempted to gain the attention of the occupants by yelling, ringing the doorbell and throwing something against the house." Plaintiff suggests that Tomo's "bizarre behavior . . . was due to the effects of the cold while he wandered in this isolated area attempting to find help. He was in the bitter cold, alone late at night in an unfamiliar place after trudging through a snowy field in the dark." (Pl. Br. at 3.)

[5]Ljubisa Perkovic is the plaintiff in this case. To avoid confusion, "Perkovic" is used only to refer to the decedent, Tomo Perkovic. "Ljubisa" or "Plaintiff" is used to refer to the plaintiff, Ljubisa Perkovic.

6

pounds and claims to have struck two baton blows "as hard as I could." (Virani Dep. at 29-20) Virani states, however, that if Heaslip had not hit Perkovic very hard, or had used the soft handle of the baton,[6] he may not have left a bruise. (Virani Dep. at 29.)

When the Michigan Attorney General's Office questioned Heaslip about the shooting, some of Heaslip's answers differed from those given in his deposition. Heaslip apparently[7] told the Attorney General's Office that his first baton strike was a "'tap' for the purpose of slowing down Perkovic's approach and as a warning to him." He also told the Attorney General's Office that he lost his baton during the course of his second strike, and he was "unclear whether or not his strike was actually completed prior to the baton being lost." (Atty. Gen. Rep. at 3.) Thus, while Heaslip's answers to the Attorney General's Office are inconsistent with his deposition, they are more consistent with the forensic pathologist's findings.

Plaintiff presents the expert opinion of a forensic consultant, David Balash, who concludes that Heaslip's baton use is inconsistent with the evidence in this case (Balash Dep. at 29-31), that Heaslip would have immediately been aware that his shot had affected Perkovic (*id.* at 25-26), and that Perkovic would not have been able to reach the baton after he was shot. (*Id.* at 32-33.)

---

[6]Heaslip states that on page 24 of the pathologist's deposition, the pathologist notes that if Heaslip used the softer handle of the baton, rather than the "sweet spot," it might not leave a bruise. Heaslip does not provide evidence to support this statement, and Plaintiff's exhibit does not include page 24 of the Virani deposition. Thus, the Court cannot verify Heaslip's assertion.

[7]This evidence comes from a report by the Attorney General's Office based on interviews with Heaslip. There is no direct evidence of Heaslip's statements.

7

Another issue that later evidence has shed light upon is whether Perkovic was physically able to act in the manner described by Officer Heaslip. Perkovic was injured in a serious automobile accident in 1999, for which he needed long-term occupational and physical therapy. (Sayas Dep. at 111-12.) His physical therapist, Fideliz Sayas, states that she saw Perkovic about three times a week from April 2003 until the day before his death. She related the following during her deposition:

> Q: Would you kindly explain to me, when you saw Mr. Perkovic in January, January 23rd, 2004, his condition, and I'd like to ask you, would he be able to walk, bend over, kick, and that type of thing?
>
> A: Yes, sir. January 23rd, he usually comes on time, and then he walk in the clinic and he's still limping, but his limping is because of his left knee, and I start my treatment . . . . I went to the gym with him and he does his routine of exercises, but there's no way that he can do any kicking.
>
> Q: So, in your opinion, in treating him and asking him to do as much as he could, did you--your impression was that he would not be able to kick out with either his left leg or his right leg?
>
> A: Yes, sir.
>
> Q: Do you think he would be able to, at least from what you observed, bend over significantly to, say, touch his toes or touch the ground and then get back up in a fast motion?
>
> A: No, sir.
>
> Q: Was he limited in the way he could walk or run?
>
> A: Yes, sir.
>
>   . . .
>
> Q: And do you think that he would be in any position to, at least when you saw him on January 23, to get in a physical struggle or fight with someone such that he could threaten them?
>
> A: No, sir.

> . . .
>
> Q: I understand that you read the deposition testimony that was described of Mr. Perkovic, is that correct?
>
> A: Yes.
>
> Q: Do you feel that, when you saw Mr. Perkovic earlier, say a day before this incident, was Mr. Perkovic able to walk, run, or kick out with his leg such as was described with some type of karate kicks?
>
> A: No.
>
> Q: And knowing him as a physical therapist, in your professional opinion as a physical therapist, would he be able to kick out at someone such that he would make--or such that he would do physical harm to that person?
>
> A: No, sir.
>
> Q: And would he be able, in your opinion, knowing his condition as you found him as a professional physical therapist, to be able to kick someone in such a manner that he would knock a steel baton out of a person's hand if that person was about six-foot four and 275 pounds?
>
> A: No, sir.

(*Id.* at 14-16, 17-18.)[8] Perkovic's brother Ljubisa echoes these opinions in an affidavit:

> I have personal knowledge that Tomo Perkovic underwent three surgical procedures to his left knee following the automobile accident in 1999. Tomo Perkovic was extremely limited in the physical activities he could do. Tomo Perkovic was unable to use his lower extremities to run, bend, squat, or to kick. I do not believe that Tomo Perkovic would be able to use either of his legs to kick or to perform what is known as a "karate kick" in order to threaten or harm a law enforcement officer.

(Ljubisa Aff.)

---

[8]Heaslip objected to this line of questioning: "I think it's outside the area of her expertise to ask whether or not a physical condition that she was treating him for as a therapist was or was not a cause of his ability or inability to do something. That's something that a medical doctor would testify to." (Sayas Dep. at 17.)

## II. Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the Court must "construe the evidence and draw all reasonable inferences in favor of the nonmoving party." *Id.* The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

## III. Discussion

The Sixth Circuit described the analytical framework applicable to this case in *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763 (6th Cir. 2004):

> The sole constitutional standard for evaluating excessive force claims is the Fourth Amendment's criterion of reasonableness. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Courts must apply an objective standard, looking to "the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect posed an immediate threat to the safety of the officers or others, and [3] whether he was actively resisting arrest or attempting to evade arrest by flight." *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992) (quoting *Graham*, 490 U.S. at 396) (brackets added).

*Id.* at 772.

Related to the question of reasonableness is qualified immunity, which protects public officials from defending lawsuits such as this absent a violation of "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A three-part inquiry guides the Court's qualified immunity analysis. First, viewing the facts in the light most favorable to Plaintiff, the Court must determine whether a constitutional violation has occurred. Second, the Court must determine whether the right violated was clearly established, about which a reasonable person would have known. And finally, the Court must determine whether Plaintiff has alleged sufficient facts, supported by sufficient evidence, to show that Heaslip's alleged actions were "objectively unreasonable in light of the clearly established constitutional rights." *Toms v. Taft*, 338 F.3d 519, 524 (6th Cir. 2003).

The Sixth Circuit has cautioned that "where the officer defendant is the only witness left alive to testify, the award of summary judgment to the defense in a deadly force case must be decided with particular care." *Burnette v. Gee*, 137 Fed. Appx. 806, 809 (6th Cir. 2005) (unpublished) (citing *Plakas v. Drinski*, 19 F.3d 1143, 1147 (7th Cir. 1994) (because the "defendant knows that the only person likely to contradict him or her is beyond reach . . . a court must undertake a fairly critical assessment of the forensic evidence, the officer's

original reports or statements and the opinions of experts to decide whether the officer's testimony could reasonably be rejected at trial")).

Plaintiff argues that genuine issues of material fact exist as to whether Officer Heaslip used his baton as he has described and whether Perkovic was physically able to act in the threatening manner that Heaslip described. These factual disputes are especially important considering that Heaslip is the only witness. Resolution is necessary, Plaintiff contends, before Heaslip's actions can be deemed reasonable.

Heaslip argues, however, that even assuming that he did not use his baton on Perkovic, and even assuming that Perkovic never threatened him with roundhouse kicks and karate kicks, his use of deadly force was not "objectively unreasonable in light of clearly established constitutional rights," and that he is therefore protected by qualified immunity. No evidence contradicts Heaslip's testimony that Perkovic threatened to kill him and then came toward him in a threatening manner. These actions alone, Heaslip argues, provide sufficient grounds for qualified immunity protection of his use of deadly force.

Heaslip's argument is unpersuasive. Even assuming, *arguendo*, that the uncontested facts alone provided sufficient grounds for qualified immunity protection of Heaslip's use of deadly force, the Court cannot discount entirely the contested facts. The Court's qualified immunity analysis cannot take place in a vacuum. Rather, the court must view *all* of the evidence, and draw the reasonable inferences, in favor of Plaintiff. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

If Perkovic did not kick at Heaslip and Heaslip did not use his baton, it means that Heaslip lied about these things. And if Heaslip lied about these two facts, one may reasonably infer that he lied about Perkovic's verbal threats and threatening manner as

12

well. What's left is an unarmed Perkovic standing alone in the middle of a remote highway. Even with notice of Perkovic's previous erratic and frightening behavior, deadly force could not reasonably be justified under these facts, and qualified immunity would not apply.

Officer Heaslip contends that the recent Supreme Court case of *Brosseau v. Haugen*, 543 U.S. 194 (2004), controls the outcome of this case. There, a police officer shot a suspect fleeing in an automobile. While that case is instructive as to qualified immunity analysis generally, the Court's holding depended on undisputed facts, and recognized that "this area is one in which the result depends very much on the facts of each case. *Id.* at 201. *Brosseau* is therefore unhelpful in resolving the factual dispute here.

Officer Heaslip has also provided the Court with a recent case presenting similar facts and an analysis that is almost directly on-point as to how to resolve the disputed factual issues facing the Court. In *Burnette v. Gee*, the decedent, Wilson, had attempted to commit suicide by overdosing on prescription medication. When a paramedic entered his home seeking to help, Wilson picked up a rifle and held it in his lap. The paramedic then left the home and called law enforcement. When the sheriff, Gee, arrived on the scene, onlookers told him that Wilson had "gone crazy" and that he had a gun. The sheriff entered the Wilson's home to try to disarm him. 137 Fed. Appx. at 807-08.

> The following sequence of events took place in a span of approximately two to three minutes and the only witness to these events is Sheriff Gee. Sheriff Gee testified that he repeatedly asked Wilson to put the gun down but Wilson refused. Wilson stood up from the chair, held the rifle with his right hand near the trigger, and stated that he just wanted to die and go to hell. Wilson sat back down in the chair, placing the butt of the rifle between his right hip and the arm of the chair with the barrel pointing to the floor. Wilson then reached down to put on his left shoe. Sheriff Gee thought that this was a good opportunity to disarm Wilson, so he drew his own gun and charged toward Wilson. As Sheriff Gee approached Wilson, Wilson grabbed his rifle and raised it towards Sheriff Gee. Sheriff Gee grabbed the rifle with his left

>hand and tried to push it down since he felt the barrel of the rifle against his vest near his waist line.  When Sheriff Gee was unable to wrestle the rifle from Wilson, he shot Wilson four times until he ceased struggling.  Sheriff Gee testified that when Wilson grabbed the rifle and resisted Sheriff Gee's attempt to disarm him, he believed that his life was in danger and he shot Wilson to protect himself.  Wilson died as a result of the gunshot wounds.

*Id.* at 808.

On appeal, the plaintiff argued that "issues of material fact exist as to whether Wilson even reached for his rifle in response to Sheriff Gee's charge." *Id.* at 810.  Thus, if a jury could find that Wilson did not reach for his gun, it could also find that the sheriff's conduct was unreasonable.  The court noted,

>Unfortunately for the appellants, no direct evidence exists to rebut Sheriff Gee's version of the events. Furthermore, even considering the circumstantial evidence presented by Appellants in a light most favorable to them, there is no reasonable basis for overturning the district court's finding that Wilson reached for or raised his rifle and struggled with Sheriff Gee over the weapon, and that as a consequence, Sheriff Gee reasonably feared for his life when he shot Wilson.

*Id.*

The court discussed three pieces of evidence that the appellant had presented to contradict the sheriff's testimony.  First, the court held that testimony from Wilson's mother, who had been in the room and seen the rifle "upright on the outside of the right arm of the chair," did not conflict with the sheriff's testimony, since Wilson had an opportunity to move the rifle after Wilson's mother had seen it.  *Id.* at 811.

Second, the court discussed a report by a doctor concluding that "the effects of the drugs consumed by Wilson prior to the shooting would result in 'sedation rather than agitation and aggressive behavior.'"  *Id.*  The court noted that "the doctor's conclusion . . . does not actually conflict with Gee's statement that Wilson reached for and grabbed his

14

rifle. By all accounts, Wilson was not asleep or unconscious and he was alert enough to talk to the paramedics, his family, and with Gee. Wilson could have been more sedated than usual, but still have managed to grab the rifle." *Id.* Importantly, the court offers a useful piece of dicta: "If, for example, Dr. Nichols testified that Wilson *would not have been able* to react to Gee and reach over and pick up his rifle, then there would be a controverted material fact." *Id.* (emphasis added).

Finally, the court discussed a report by a forensic consultant concluding that Wilson had been shot from a distance of ten to twenty inches, and that it was therefore impossible for Wilson to have been pointing his forty-inch rifle at the sheriff at the time the sheriff shot him. The court concluded that this evidence did not conflict either, since the sheriff claimed only to have shot Wilson while struggling over the rifle, but not while the rifle was pointed at him. *Id.*

Having found that none of the appellant's evidence actually conflicted with the sheriff's version of events, the court upheld the district court's grant of summary judgment to the defendants on the constitutional issues.

In the present case, Heaslip cites *Burnette* for the proposition that "simple opinion testimony . . . in and of itself is not sufficient to create a question of fact on the issue of whether the shooting was justified." (Repl. Br. of Pl. at 6.) Heaslip argues that the opinion testimony of Plaintiff's forensic consultant does not create a genuine issue of material fact.

Heaslip's argument is well taken, and *Burnette* appears to render much of Plaintiff's evidence insufficient to overcome Heaslip's testimony. But as the Sixth Circuit notes, if evidence makes clear that Perkovic "would not have been able to" act in the threatening

15

manner alleged by Heaslip, a question of material fact exists. 137 Fed. Appx. at 811 (emphasis added).

Perkovic's physical therapist[9] makes perfectly clear in her deposition testimony that "there's no way that he can do any kicking" (Sayas Dep. at 15), and Officer Heaslip states that Perkovic physically threatened him by doing "karate-type" kicks and "roundhouse kicks" at him. Thus, Plaintiff's evidence will show that Perkovic "would not have been able to" act in the manner that Heaslip claims justified the use of deadly force. Viewing the evidence in the light most favorable to Plaintiff, Sayas's testimony creates a genuine issue of material

---

[9]Plaintiff seems to present Perkovic's physical therapist as an expert witness:

> Fideliz Sayas is a licensed physical therapist employed at Quality Care [Rehabilitation Professionals]. She earned a bachelor's degree from D'LaSalle University in the Philippines in 1986 and has been practicing physical therapy since that time. She treated Perkovic at Quality Care from April 22, 2003, until his death . . . . Sayas read the deposition testimony of Defendant Heaslip describing the shooting. In her opinion, Perkovic would not have been able to run or kick out with his leg as described by Heaslip.

(Pl. Br. at 14.) Heaslip contends that "Ms. Sayas is not qualified to give an opinion to this Court as to whether or not the medical condition from which Plaintiff's decedent suffered would have enabled him to perform the actions described. She is merely a physical therapist." (Def. Repl. Br. at 3.)

The parties have not argued whether Ms. Sayas's testimony is best characterized as expert witness testimony or lay witness testimony. The Court need not answer this question now, however. Sayas might testify based on her "opinions and inferences," Fed. R. Evid. 701, that for three times a week over a span of almost a year, she has personally observed Perkovic physically exerting himself to the extent of his capability, and has watched him fail time and again to kick either of his feet in the air. Or, she might testify that based on her "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, she believes that the physical limitations she knows Perkovic to have do not permit him to kick either of his feet in the air. For purposes of this Motion, the form of Sayas's testimony is unimportant. Whether she testifies as an expert or as a lay witness, she can establish that Perkovic was unable to kick.

fact in this case. It is up to a jury, rather than this Court, to resolve this difficult question.[10]

## IV. Conclusion

The above analysis presumes neither that Officer Heaslip acted reasonably nor that he acted rashly. One can only imagine the stress he faced on the evening of January 25, 2004, in the moments before he encountered Tomo Perkovic. This case illustrates the difficulties that law enforcement officers must face on a daily basis.

In an excessive force case such as this, the Court must look to the reasonableness of the police officer's actions, an issue which depends largely on "whether the suspect posed an immediate threat to the safety of the officer[]." *Graham*, 490 U.S. at 396. Because a genuine issue of material fact remains regarding whether Perkovic actually posed an immediate threat to the safety of Officer Heaslip, summary judgment is inappropriate.

Being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby GRANTS Defendants' Motion for Summary Judgment as to Defendants Krueger and the City of Marine City. The Court DENIES Defendants' Motion for Summary Judgment as to Defendant Officer Heaslip.

---

[10]Heaslip's cross examination of Sayas revealed several potential weaknesses in her testimony. Sayas opined (after first declining to comment) that Perkovic was unable to swing a shovel, though several witnesses testified to seeing him do so. Sayas also states that in her opinion, Perkovic could not run, though one witness saw him do so. (Sayas Dep. at 27-31.) While these statements are relevant to Sayas's credibility as a witness, they do not render her testimony insufficient to overcome a motion for summary judgment.

                    s/Nancy G. Edmunds
                    Nancy G. Edmunds
                    United States District Judge

Dated: January 30, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record on January 30, 2006, by electronic and/or ordinary mail.

                    s/Carol A. Hemeyer
                    Case Manager